■ In the Matter of NIAGARA MOHAWK POWER CORPORATION, Petitioner, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.—Mikoll, J. Proceeding pursuant to CPLR article 78 (transferred to this court by order of the Supreme Court at Special Term, entered in Albany County) to review a determination of respondent which, inter alia, ordered petitioner to refund excessive fuel adjustment charges.

In an opinion issued September 19, 1983, respondent con-

cluded that, based upon hearing evidence, petitioner had been imprudent in certain of its decisions and practices in the past and that the cost of this imprudence had been passed on to petitioner's customers through rate adjustments made under fuel adjustment clauses (FACs). However, because respondent felt that petitioner was not put on notice that the hearing record would be used as the basis for a prudence determination rather than as evidence of the effect of a full-recovery . FAC on its operations, petitioner was afforded an opportunity to respond in limited further hearings to any proposal to adjust for previous "overrecovery" of fuel costs. Respondent delineated five charges of imprudent activity on petitioner's part which were to be addressed in the course of these further hearings:

1. The prolonged power outage at petitioner's Dunkirk Unit No. 3 in 1980;

2. The prolonged power outage at petitioner's Dunkirk Unit No. 3 in 1981;

3. Certain of petitioner's equipment procurement practices at its Oswego Unit Nos. 5 and 6;

4. The degradation in heat rates at petitioner's coal- and oil-fired generating units at Oswego from 1977 to 1981 and the reasonableness of petitioner's response to those problems; and

5. The reasonableness of petitioner's response to boiler tube leaks at its coal-fired generating units at Huntley and Dunkirk from 1977 to 1981.

A hearing on these "prudence matters" was held in January 1984 before two Administrative Law Judges (ALJs). The ALJs concluded in their recommended decision that petitioner was imprudent in regard to the first two matters and stated that petitioner should refund to its customers $1.013 million in excessive fuel charges. Thereafter, respondent reviewed this decision and modified it by concluding that petitioner had been imprudent not only in matters Nos. 1 and 2, but also in matter No. 4, insofar as it related to petitioner's coal-fired units, as well as in its handling of matter No. 5. Respondent directed that petitioner refund $32.5 million in excessive fuel charges (later revised to $31.9 million because of errors in calculation) to its customers. Petitioner instituted this CPLR article 78 proceeding to review both respondent's finding of imprudence as to matters Nos. 1, 4 and 5 and its ordered refunds. The proceeding was transferred to this court.

By way of background, it should be noted that utilities recover costs incurred for fuel in two ways: first, they set forth

base rates in tariffs, which respondent reviews and approves pursuant to Public Service Law § 66 (12); and second, they make monthly adjustments in customers' bills through FACs according to a formula previously approved by respondent. A FAC: "is a provision designed to reflect monthly increases above or decreases below the 'base cost' for fuel used by the utility. It operates by means of a formula, included in each company's filed rate schedule, which determines a monthly rate adjustment to the charge for each kilowatt hour of electricity used by a consumer" *(Matter of Consumer Protection Bd. v Public Serv. Commn.,* 85 AD2d 321, 322, *appeal dismissed* 57 NY2d 673 [upholding the legality of FACs employed by electric utilities]). By their automatic nature, FACs allow a dollar-for-dollar recovery of actual fuel costs to the utility. However, FAC charges, once collected in a year are "rolled into" base rates, i.e., become part of the base rate for the succeeding year. Petitioner collected more than $729 million through FACs in the years 1977 to 1982.

Petitioner's first contention, that respondent acted outside its authority when it directed petitioner to refund excessive fuel charges before June 22, 1981, the effective date of the Laws of 1981 (ch 304, § 1), amending Public Service Law § 66 (12), is well taken. Express statutory authority is required before respondent may lawfully order refunds. Public Service Law § 66 (12) did not contain such express authority prior to its June 22, 1981 amendment.

Respondent, like other agencies, has only those powers expressly delegated to it by the Legislature *(Matter or Consolidated Edison Co. v Public Serv. Commn.,* 47 NY2d 94, 102, *revd on other grounds* 447 US 530, *revd on remand on other grounds* 51 NY2d 816; *Matter of Village of Boonville v Maltbie,* 272 NY 40, 47). However, it may exercise powers incidental to its express powers *(Kovarsky v Brooklyn Union Gas. Co.,* 279 NY 304; *Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 54 AD2d 255, 256) or necessarily implied from such powers *(Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., supra).* Where a statute is clear and explicit in its language, an omission in the statute may not be supplied by construction *(Eastern Paralyzed Veterans Assn. v Metropolitan Transp. Auth.,* 79 AD2d 516, 517, *appeal dismissed* 52 NY2d 895; McKinney's Cons Laws of NY, Book 1, Statutes § 74). This court has consistently held, in construing various sections of the Public Service Law, that respondent could not order refunds without express statutory language *(see, e.g., Matter of Rochester Tel. Corp. v Public Serv. Commn.,* 87

AD2d 672, 673, *affd* 58 NY2d 874; *Matter of Long Is. Light. Co. v Public Serv. Commn.,* 80 AD2d 977, *lv denied* 54 NY2d 601; *Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., supra).*

We reject respondent's assertion that it had implied authority, prior to June 22, 1981, to allow refunds by means of the 1974 amendment to Public Service Law § 66 (12), which empowered respondent to hold hearings concerning the propriety of any increased rate or charge for fuel cost (L 1974, ch 863, § 1, eff June 10, 1974). Public Service Law §§ 4, 5, 65 and 66 give respondent broad powers, but these powers have been held insufficient to order refunds. Nor is respondent's authority to hold hearings enough to imply the power to order refunds.

We find unpersuasive respondent's contention that, because in the past it construed the statute to authorize it to order refunds, it now has the power to do so. An agency's creation of rules and/or regulations without a statutory predicate, expressed or implied, cannot be used to supply the statutory deficiency and is no more than "boot-strapping" *(see, Matter of Bates v Toia,* 45 NY2d 460, 465). Respondent's argument that legislative history indicates it has the implied authority to order refunds is also found wanting. The history is inconclusive.

Respondent's further claim that the automatic operation feature of FACs indicates that it has the implied authority to order refunds is also rejected. Petitioner has a recognized property right in FAC recovery, and respondent has the opportunity to review that recovery since FACs are "rolled over" into the base rate each year. Moreover, review of FAC costs are not so different in character from review of other costs involved in rate making so as to make FAC review unique, as respondent asserts. An after-the-fact assessment of reasonableness appears appropriate in each review. Thus, the uniqueness claimed does not exist. In view of the above analysis, we must conclude that respondent lacked the authority to direct petitioner to refund to its customers excessive fuel charges imposed prior to June 22, 1981.

Petitioner next contends that its right to due process was violated due to lack of notice that refunds for the year 1982 would be at issue at the limited hearings. This contention is without merit. Petitioner received sufficient notice to meet due process requirements. The ambiguity concerning the issues to be covered was cleared up in the ALJ's ruling of August 26, 1983, which stated that the issue of refunds for the year 1982

would be raised at the hearing. The hearing did not commence until January 10, 1984. Thus, petitioner was given ample notice that the year 1982 was involved and had ample opportunity to prepare a defense.

Petitioner's arguments (1) that the refunds ordered by respondent respecting heat rates[1] and boiler tube leaks (matters Nos. 4, 5, *supra)* were based on calculations developed by respondent in a prior opinion, (2) that no causal link connected the actions complained of with the alleged increase in costs, and (3) that respondent's calculations, not based on testimony in the record, denied petitioner an opportunity to be heard, are not persuasive. Respondent clearly stated at the time it ordered the limited hearings before the ALJs that, in the areas of heat rate degradation and boiler tube leaks, the facts had been fully developed at the initial hearing of this matter, but that the issue of petitioner's prudence remained. Additionally, respondent stated that "some limited hearings are necessary to determine the dollar amount of any such adjustment, which presumably would be based on the higher fuel costs attributable to the increased boiler tube leak losses over the level experienced in 1977". The ALJs found no imprudence on the part of petitioner for either heat rates or boiler leaks, but discussed calculation of refunds and offered some rebuttal to the calculations that respondent's staff suggested. Respondent credited petitioner's argument. Thus, respondent's calculation had a rational basis in the record *(see, Matter of Brooklyn Union Gas Co. v Public Serv. Commn.,* 101 AD2d 453, 456-457).

We also find without merit petitioner's argument that respondent's determination is irrational or unsupported by substantial evidence. The record demonstrates that petitioner's 10 coal-fired generating units clearly experienced marked degradation in operating efficiency; this caused increased heat rates which required the burning of more fuel and resulted in increased costs to consumers. The record also indicates that petitioner failed to implement the so-called "Young recommendations"[2] until it was, apparently, concerned about losing the FAC, even though many of the Young recommendations

---

1. A "heat rate" is a measurement of a generating unit's over-all thermal efficiency and refers to the amount of heat energy required to produce a kilowatt hour of electricity. The higher the heat rate, the lower the efficiency of the generating unit.

2. These recommendations were the result of a report, dated September 1977, following a management and operations audit performed by Arthur Young and Company.

set forth simple steps that could be taken by petitioner. In addition, the record shows that petitioner recognized and failed to deal with its problems with gravitization and boiler tube leaks. Finally, there is evidence that petitioner's failure to plan the 1980 outage at Dunkirk Unit No. 3, when viewed in light of the Young recommendations, its own outage report and its previous outage performance, was, for the most part, the cause of the 10 unanticipated days.

Petitioner's assertion that respondent did not employ the proper standard to evaluate petitioner's alleged imprudence is not persuasive. The ALJs used a reasonable business judgment test in making their evaluation. They opined that, "Utilities cannot reasonably be held to a standard based upon an ideal * * * While * * * [petitioner] could clearly have done more * * * the record in our view does not show the kind of negligent inattention that would reach the level of imprudence and justify a penalty."

Respondent found the ALJs to be too lenient and held petitioner to a higher standard. This was not irrational in view of the automatic fuel clause which spared petitioner from the consequences of its failure to take reasonable steps before 1981 to ascertain and remedy the cause of its loss of $1.18 million a month in January and February of 1979.

Considering all of the circumstances present herein and the nature of FACs, the higher standard used by respondent in evaluating petitioner's conduct on the issue of prudence is not irrational and its determination is supported by substantial evidence. Therefore, the determination should be modified by annulling so much thereof as ordered refunds to customers for the period preceding June 22, 1981.

Determination modified, without costs, by annulling so much thereof as ordered refunds of excessive fuel charges imposed prior to June 22, 1981; matter remitted to respondent for further proceedings not inconsistent herewith; and, as so modified, confirmed. Main, J. P., Casey, Mikoll, Yesawich, Jr., and Harvey, JJ., concur.